SCHOOL COMMITTEE OF BOSTON & others[1] *vs.* LABOR
RELATIONS COMMISSION & others.[2]

Suffolk.   September 21, 1987. — September 24, 1987.

Present: GREANEY, C.J., ARMSTRONG, & KASS, JJ.

*Public Employment*, Strike. *Labor*, Strike by public employees. *School and School Committee*, Transportation of students.

The Labor Relations Commission correctly determined that bus drivers employed by two corporations which, under contracts with the school committee of Boston, provide school bus transportation services for public school students are not "public employees" for purposes of the requirement of G. L. c. 150E, § 9A (*b*), that the commission determine, after investigation, whether an illegal strike by public employees has occurred. [726-730]

APPEAL from an order of the Labor Relations Commission.

*Judith S. Yogman*, Special Assistant Corporation Counsel (*John S. Stadler*, Special Assistant Corporation Counsel, with her) for School Committee of Boston.

*Scott C. Moriearty* (*Harriet E. Gould* with him) for National School Bus Service, Inc., & another.

*Amy L. Davidson* (*Judith Neumann* with her) for Labor Relations Commission.

*Warren H. Pyle* for Local 8751, United Steelworkers of America, AFL-CIO, CLC.

GREANEY, C.J.   On September 10, 1987, the school committee of Boston (committee) together with National School Bus Service, Inc., and Transcomm, Inc. (bus companies), filed with the Labor Relations Commission (commission) a petition for investigation of a strike, pursuant to G. L. c. 150E,

---

[1] National School Bus Service, Inc., and Transcomm, Inc.

[2] Local 8751, United Steelworkers of America, AFL-CIO, CLC.

§ 9A(*b*), inserted by St. 1973, c. 1078, § 2.[3] The petition alleged that Local 8751, United Steelworkers of America, AFL-CIO, CLC (union), and the bus driver members of the union who provide school bus transportation services for Boston public school students, were engaging in a strike in violation of G. L. c. 150E, § 9A(*a*). The commission conducted an immediate investigation, which included the taking of testimony and the examination of many documents. In a lengthy written decision, the commission concluded that the bus drivers do not work for a public employer and entered an order dismissing the petition. The committee and the bus companies have appealed. See *Boston Housing Authy.* v. *Labor Relations Commn.*, 398 Mass. 715, 716-717 (1986). We affirm the commission's order.

The following facts found by the commission are undisputed. The committee and the bus companies operate under three written contracts. Using vehicles provided by the committee, the bus companies transport children to and from the Boston public schools on numerous bus routes,[4] according to bus schedules provided by the committee's director of transportation. The vehicles may not be used for purposes other than performance of the contracts.

The committee provides storage and maintenance facilities for the vehicles. For performing their services, the bus com-

---

[3] General Laws c. 150E, § 9A, states:

"(*a*) No public employee or employee organization shall engage in a strike, and no public employee or employee organization shall induce, encourage or condone any strike, work stoppage, slowdown or withholding of services by such public employees.

"(*b*) Whenever a strike occurs or is about to occur, the employer shall petition the commission to make an investigation. If, after investigation, the commission determines that any provision of paragraph (*a*) of this section has been or is about to be violated, it shall immediately set requirements that must be complied with, including, but not limited to, instituting appropriate proceedings in the superior court for the county wherein such violation has occurred or is about to occur for enforcement of such requirements."

[4] One of the contracts (with Transcomm) also involves transportation of special needs children out of and into the city. In addition to the regular bus routes, the buses are used for charter services for the school children.

panies receive a management fee. The bus companies pay all the expenses incurred during the performance of the contracts in the first instance. The committee then reimburses the companies for "reimbursable driver wages" and other necessary expenses associated with performance of the contracts. The contracts require the bus companies to maintain financial and other records (such as fuel records and mileage logs) which must be accessible to the committee for inspection.

Drivers are hired by the bus companies subject to certain general requirements set by the committee: the bus companies must endeavor to employ Boston residents as fifty percent of the workforce; preference must be given to drivers who worked for the predecessor contractor (ARA Services, Inc.); and careless or incompetent drivers must not be hired, including "any person with an unacceptable criminal record." The committee may reject drivers it deems "unfit for such employment." In this regard, the committee conducts an independent criminal records check on each applicant for a driver's job. The bus companies enforce certain driver rules established by the committee (rules principally concerned with the safety of children riding the bus companies' vehicles). The contracts, however, also provide that, without regard to the committee, the bus companies will "enforce any driver work rules which are provided for in the collective bargaining agreement binding the [bus company] and the drivers, as a collective bargaining unit."

There is also a provision within each contract entitled "Relationship with City". This provision states, among other things, that "[t]he [company's] relationship to the City shall be that of an independent contractor" and, further, that "[n]either [the company] nor its agent or employees shall be considered as having the status or any pension rights of a City employee . . . ."[5] Two of the contracts further provide that,

[5] As the commission found, in the most recent (September 1, 1987) contract between the committee and Transcomm, the words "the status or any" have been omitted from this provision. The language designating the status of Transcomm as an independent contractor remains unchanged.

This provision also gives the committee the option of controlling procedural and substantive aspects of arbitration proceedings involving disciplinary action by the bus companies against drivers.

if the collective bargaining agreements between the bus companies and the union do "not contain both a 'no-strike' clause and a 'grievance arbitration' clause," and if a strike adversely affects the bus companies' performance on a designated portion of the routes, the committee may deduct a portion of the pertinent management fee for each school day affected by the strike.[6]

The commission also noted that the collective bargaining agreements between the bus companies and the union comprehensively govern the relationship between the parties to those contracts. The agreements establish different types of hourly rates for various types of work performed by union members and contain provisions concerning hours of work, pay and benefits, seniority, grievance and arbitration procedures, employee training, and a host of other matters pertaining to the wages, hours, and conditions of employment of union members. The collective bargaining agreements also give the "[c]ompany . . . the right to discharge, suspend, or discipline any employee . . . for just cause" on grounds particularly described therein. There are provisions barring strikes. Finally, the agreements provide that the terms of contracts between the committee and the bus companies control any inconsistent provisions of the collective bargaining agreements. Each agreement expressly recognizes that the specific bus "[c]ompany is employing the employees covered by this [collective bargaining] agreement."

The commission also made findings with respect to the committee's involvement in the collective bargaining with the union and the predecessors of the bus companies. Prior to 1985, the committee was never involved in negotiations between a bus company and the union. The committee's labor representative became involved in negotiations in 1985, primarily to assist in effectuating new work rules and procedures desired by the committee in its transfer of the work from a prior company (whose performance had been unsatisfactory) to the present

---

[6] The third contract, signed on September 1, 1987, with Transcomm, unconditionally mandates the inclusion of "no-strike" and "grievance-arbitration" clauses in any collective bargaining agreement.

bus companies. In January, 1986, the committee approved (by signatures of its representatives) several proposals designed to end a disruptive strike by the union. However, only representatives of the bus companies and the union actually executed the collective bargaining agreement that followed the strike. Since then, no committee representative has actually participated in negotiation sessions between the bus companies and the union. The committee's representatives furnish "guidelines and parameters" for bargaining. While the bus companies seek approval from the committee for virtually every proposal, the companies have not represented to the union during current negotiations that they represent the committee's interests or that prior committee approval of any proposed agreements is necessary before the bus companies can execute them.

The commission also made extensive findings of fact about the day-to-day relationships between the bus companies, the committee, and the bus drivers. The committee has no representative on the board of directors of either bus company. National, which operates in six States, maintains an extensive number of managers to meet its obligations (a general manager, an operations manager, a training and personnel manager, two terminal managers, dispatchers and five road supervisors). As to daily operations, the commission specifically found that the companies: (a) provide supervisors for all aspects of daily work; (b) directly enforce all work rules; (c) hire all drivers (subject to the committee's criminal records check previously mentioned);[7] (d) fire or discipline drivers without authorization from the committee;[8] (e) pay employees, retain and remit withholding taxes and maintain their personnel records; (f) enforce requirements on routes, schedules and vehicles; (g) assign particular drivers to routes through the collectively bargained bid procedures; and (h) reassign drivers in keeping with the agree-

---

[7] By law, the bus companies have no access to applicants' criminal records, but the committee may be granted limited access by the Criminal History Systems Board. See G. L. c. 6, § 172.

[8] The committee may also direct the bus companies to fire or discipline drivers, and, when it has done so, the companies have complied.

ments subject to a general condition that drivers may be reassigned only twice during the school year without prior approval from the committee's director of transportation.

1. The issue is whether the bus drivers work for a public employer, namely the committee. If they do, i.e., if they are "public employees," the commission must entertain a petition to investigate a claim of a strike under G. L. c. 150E, § 9A(b), see *Allen* v. *School Comm. of Boston*, 396 Mass. 582 (1986), and, if an unlawful strike is found, take steps to bring the strike to a conclusion.

There is no question that the vendor contracts (agreements to supply materials or services to a government agency are commonly called "vendor contracts") between the committee and the bus companies closely regulate many aspects of the relationship between the parties to the collective bargaining agreements. This is to be expected. The assignment of busing 27,000 children to Boston schools safely, and at reasonable expense to the taxpayers, poses a formidable task which requires the committee, if it is to perform the assignment adequately in light of duties imposed on it by statutes and Federal court orders, to monitor carefully the activities of those contractually entrusted with the daily implementation of the job. Use of third parties to do the work is not unusual. Careful oversight of the third parties is to be expected and, taken alone, is not decisive. It would unreasonably limit the flexibility of governmental bodies to buy goods and services, particularly when the public need may be transient, if the employees of third-party vendors are automatically transmuted into public servants just because the government supervises the vendor closely.

The contracts, insofar as they relate to the bus companies' actual expenses, are "pass through" or "cost plus" contracts which allow the bus companies to charge back to the committee almost all costs of performance. The economic realities of such contracts necessarily call for close committee scrutiny of all major financial costs of the contracts. In this respect, the committee has reserved powers of control frequently retained by governmental agencies, both State and Federal, in dealing with

private contractors operating on a cost-plus basis. The examination and approval of the companies' expenses (including some right to approve their major expense, drivers' wages and fringe benefits) ensure, as far as possible, fiscal responsibility on the part of the bus companies and adherence to the committee's budgetary constraints.

The contracts also reflect the added consideration of the safety of the children who ride the vehicles and the necessity of getting them to and from school on time. Here, the committee has retained, as it had a right to do, the power to prescribe certain general requirements for the drivers who will operate the vehicles, the power to terminate unfit drivers not already terminated or disciplined by the companies, and the right to see that daily bus schedules are being efficiently met.

As recognized by the commission, the contracts provide a general framework for massive and expensive busing operations. Within this framework the committee has recognized (and taken pains to ensure) that the bus companies remain independent of the city and that the drivers are bus company rather than committee employees. Significant in this regard are the facts that the companies retain authority to hire and fire drivers and the right to determine the benefits and conditions of employment,[9] to assign routes, and to provide front-line supervision of the day-to-day operations of the system. The contracts also carefully provide that the bus drivers will not participate in benefits shared by city employees.

Very significant also is the explicit stipulation in the contracts that the relationship between each of the bus companies and the city is that of an independent contractor. This designation of status is not to be ignored, particularly as the designation has been maintained in the contract of each of the vendors

---

[9] The commission found it "unclear" whether the committee's right to approve collective bargaining agreements leaves the bus companies free to negotiate wages in excess of those approved as reimbursable by the committee, any excess being nonreimbursable costs under the vendor contracts, or whether the committee has an absolute right to veto wage rates paid to drivers. We do not consider the lack of a clear answer to this question decisive in this case.

since the inception of the busing program. We agree with the commission that, considered with the other circumstances described, this designation is "compelling evidence of the status of the bus drivers." This is particularly so because, over the past ten years, the committee has acted consistently with the designation by keeping arm's-length distance from collective bargaining negotiations between the companies and the union,[10] and insisting that the collective bargaining agreements designate the bus drivers as "employees" of the companies. It is worth noting that the collective bargaining agreements contain no-strike clauses (and the contracts contain penalty provisions for strikes), which suggests recognition by the parties that the remedies provided by G. L. c. 150E, § 9A, are not available.

Finally, the commission's view on the matter is entitled to some deference, as the commission has the primary responsibility for enforcing the statute and has developed considerable expertise in the area of labor relations. As noted in part 2 of this opinion, the commission has acted consistently with its precedents in reaching the conclusion under review. In a situation as complex as this, some ambiguity must be expected. We agree with the commission's conclusion that the present facts do not show such a pervasive control of the bus companies by the committee that the companies' drivers must be deemed to be public employees.

2. We have reviewed the cases in which the commission has had occasion to study the "public employer" — "private employer" question. They reflect the rich variety of facts which employment connected with a governmental purpose may present. In four instances in which the commission determined that a public employer was involved and, therefore, that G. L. c. 150E applied, it may be said that the supervisory and fiscal links were more direct and comprehensive than those in the case before us. Absent from those cases was a distinct declaration of the independence of the employer unit from the status of agent of the governmental body. See and compare *City of*

---

[10] This pattern was broken only once during 1986, and then, it appears, when all stops were pulled out to settle a discouraging strike.

*Newton,* 6 M.L.C. 1946, 1947-1950 (1980). See *Shore Collaborative,* 7 M.L.C. 1351, 1352-1353 (1980); *Franklin Inst.,* 12 M.L.C. 1063, 1064-1067 (1985); *Worcester Sch. Comm.,* 13 M.L.C. 1471, 1482-1486 (1987).

3. We reject the argument of the committee and the bus companies that the commission's decision is inconsistent with a prior decision by the National Labor Relations Board concerning the contractual relationship between one of the bus companies (National) and the committee. The NLRB decision in question, *National Sch. Bus Serv., Inc.,* 1-RC-18, 795 (N.L.R.B. December 10, 1986), declined NLRB jurisdiction over a petition to certify the union as the collective bargaining representative for certain of National's mechanics and mechanics' helpers on the ground "that the [e]mployer [i.e., National] has not retained sufficient control over the most basic of its labor relations policies to engage in meaningful collective bargaining with the [union]."

Under § 2(2) of the National Labor Relations Act, 29 U.S.C. § 152(2) (1982), the term "employer" is defined to exclude "the United States . . . or any State or political subdivision thereof . . ." thus precluding NLRB jurisdiction. Under § 14(c) (1) of the Act, 29 U.S.C. § 164(c)(1) (1982), the NLRB "may . . . decline to assert jurisdiction over any labor dispute . . . where, in the opinion of the [NLRB], the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction . . . ." In applying these provisions to employers who provide governmental services, the NLRB has established a two-part test, "whether the employer itself meets the definition of 'employer' in Section 2(2) of the Act and, if so . . . whether the employer has sufficient control over the employment conditions of its employees to enable it to bargain with a labor organization as their representative." *National Transp. Serv., Inc.,* 240 N.L.R.B. 565, 565 (1979). *Res-Care, Inc.,* 280 N.L.R.B. 670, at 670 n. 1, and at 672 (1986).[11] The *National Sch. Bus Serv.* case concerned the

---

[11] The *National Transp. Serv.* case rejected a previously used "intimate connection" standard "under which jurisdiction was withheld if the private

second part of the test. It was conceded in that case (by National, among others) that National was the "employer" within the meaning of § 2(2) of the Act. Indeed, the analysis in the decision would have been quite unnecessary if the committee had been regarded as the employer; exemption in that instance would have been automatic, under the first part of the test. To the extent that the NLRB's 1986 decision has any bearing on the case before us, it tends to support the commission's decision that the committee is not the employer of the bus drivers.[12]

*Order of the Labor Relations*
*Commission affirmed.*

---

employer performed functions that were intimately related to allegedly traditional government functions of the exempt entity [i.e., the government unit]." *Res-Care, Inc., supra,* at 672.

[12] Phrased another way, the issue before the commission was: Is National (private) or the committee (public) the "employer" of the school bus drivers? The issue before the NLRB was: Is National, as the employer of the school bus mechanics and maintenance personnel, sufficiently constrained in its conduct of collective bargaining by the requirements of the committee that the NLRB should decline as a discretionary matter to exercise its jurisdiction over labor relations in the private sector? Other examples of NLRB declinations of jurisdiction over private sector employers include *Mystic Valley Mental Health Assn.,* 1-RC-18, 135 (N.L.R.B. 1984), and *Mystic Valley Mental Health Center Assn.,* CR-3638 (Labor Relations Commission 1984); *Vinfen Corp.,* 1-RC-18, 096 (N.L.R.B. 1984), and *Vinfen Corp.,* CR-3637 (Labor Relations Commission 1984). See also *Target, Inc.,* 263 N.L.R.B. 781 (1982), a rejection of jurisdiction by the NLRB over a nonprofit Massachusetts corporation that provided residential mental health care and vocational day care services for mentally retarded adults by contract with the Department of Mental Health. There seems little question that Target, Inc., would be a private employer within G. L. c. 150A, § 2, as amended through St. 1983, c. 509, § 2.