King, J.
This is an action for, inter alia, injunctive relief pursuant to G.L.c. 214, §6 which governs injunctions “in any case growing out of or involving a labor dispute.” Pursuant to G.L.c. 212, §30, the Chief Justice for the Superior Court appointed and convened a panel of three justices of the Superior Court (Panel) to hear this matter. On November 3 and 4, 1999, the Panel held an evidentiary hearing as required by G.L.c. 214, §6. Upon the close of plaintiffs’ argument, witnesses and submissions of extensive exhibits, defendants moved the Panel to direct a verdict on plaintiffs’ claim for injunctive relief. The Panel allowed defendants’ motions, and for the reasons discussed below, denied plaintiffs’ motion for preliminary injunction. Upon request of plaintiffs, the Panel shall, pursuant to G.L.c. 214, §6(6) report the denial of injunctive relief to the Supreme Judicial Court.

PROCEDURAL HISTORY

Defendants Massachusetts Bay Transportation Authority (MBTA) and Bay State Transit Services (Bay State) recently executed a contract for Bay State to take over from Amtrak the maintenance and related shop work of the MBTA’s commuter rail service. Plaintiffs, certain railroad unions who represent Amtrak employees working on the commuter rail lines, commenced this action against the MBTA, Bay State, and Bay State’s principal shareholders, Herzog Transit Services, Inc. and Boise Locomotive Company, to enjoin the MBTA and Bay State from implementing their new contract until an arbitrator decides whether the substantive and procedural terms of a “13(c) Agreement” executed between plaintiffs and the MBTA apply to this new contract and to compel the MBTA to submit to arbitration (Count II).[3]
Specifically, plaintiffs seek an injunction to (1) prohibit the MBTA and Bay State from taking any action regarding “solicitation, recruitment, interviewing, conducting of physicals or hiring of persons to perform maintenance of equipment and related shop work for the MBTA’s commuter rail service until all disputes with respect to the change from Amtrak to Bay State” have been resolved by arbitration and (2) compel the MBTA to submit the disputed issues to arbitration. Defendants oppose the motion on the grounds that plaintiffs have failed to satisfy both the stringent requirements of the Anti-Injunction Act. G.L.c. 214, §6(A) and the standards for issuance of a preliminary injunction under Mass.R.Civ.P. 65(b).
On October 5. 1999, the court (Brassard, J.) issued a temporary restraining order in favor of plaintiffs enjoining defendants from taking any steps to implement the contract until plaintiffs’ issues have been decided in arbitration. The court noted that “to the extent that the Anti-Injunction Act applies,” the temporary restraining order was issued in accordance with its requirements. Additionally, at the hearing on the current motion, plaintiffs and the MBTA entered into a Stipulation agreeing to submit to arbitration all issues arising under the 13(c) Agreement between plaintiffs and the MBTA, including the threshold issue of whether the 13(c) Agreement applies to the transition to Bay State.

DISCUSSION

A. The 13(c) Agreement
The MBTA, a political and corporate subdivision of the Commonwealth of Massachusetts, owns certain lines of railroad which it utilizes for operation of its commuter rail service. The MBTA acquired these lines and associated shops using funds provided by the federal government under the Urban Mass Transportation Act (UMTA), 49 U.S.C. §1601 et seq. (renamed Federal Transit Act. 49 U.S.C. §5301 et.seq.). When the MBTA accepted federal funds for projects, it became subject to § 13(c) of the UMTA (now codified at 49 U.S.C. §5333(b)) which provided that:
c) Interests of employees; protective arrangements; terms and conditions. It shall be a condition of any assistance under section 3 of this Act that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance . . .
On December 10, 1974, the MBTA, plaintiffs and other transportation unions entered into a “13(c) Agreement” (Agreement) in order for the MBTA to satisfy the requirements of § 13(c) with respect to a specific grant of federal funds. The Agreement has been repeatedly applied to subsequent grants of federal funds to the MBTA for projects undertaken by the MBTA in connection with the commuter rail service. The Agreement, which applies to any action that is “a result of the [federally funded] Project, including any actions” traceable to the assistance provided, expressly states in paragraph 22 that the Agreement is *638 intended to provide employees affected by a Project with the same substantive and procedural protections set forth in § 13(c) of the Federal Transit Act.
Paragraph 5(a) of the Agreement provides that in the event the MBTA contemplates a change in operations as a result of a Project which may adversely affect employees, it shall only effect such change in accordance with the procedures outlined in the Agreement. These procedures, set forth in paragraph 5(b), include the MBTA giving the employees’ unions notice of the impending changes in operations at least 90 days beforehand. Furthermore, paragraph 5(b) of the Agreement also provides that:
At the request of either the [MBTA] or the representatives of the affected employees, negotiations for the purpose of reaching agreement with respect to application of the terms and conditions of this agreement shall commence immediately ... If no agreement is reached within thirty (30) days from the commencement of negotiations, any party to the dispute may submit it in accordance with the procedures contained in paragraph 13(a) hereof.
Paragraph 13(a) of the Agreement provides that “[i]n the event there arises any dispute or controversy . . . with respect to the protection afforded by this Agreement, or with respect to the interpretation, application or enforcement of the provisions of this Agreement,. .. it may be submitted at the written request of any such party, to final and binding arbitration ...” Paragraph 16 of the Agreement provides that an employee affected by a Project may file a claim with the MBTA 60 days after he is terminated or laid off or within 18 months of the date his employment is “worsened” as a result of a Project.
In January 1998, in connection with the MBTA’s application for a federal grant to build the new Boston Engine Terminal, the Department of Labor issued a certification letter in which it made the terms and conditions of the Agreement applicable to that project and part of the contracts of assistance made with respect to that project. Furthermore, the DOL enclosed “Attachment A” which it mandated be included by reference in any contracts of assistance entered into by the MBTA. Specifically, Attachment A requires that the MBTA ensure that any entity which manages or operates the system under a contract with the MBTA agree to be bound by the terms and conditions of the Agreement and that acceptance of responsibility of the Agreement is a condition precedent to such contractual arrangements.

B. Transfer of Mechanical Operations from Amtrak to Bay State

Operating a commuter rail service involves inspection. maintenance, repair and cleaning of the rail cars along with related shop functions such as moving the trains in and out of the shops, inspection, maintenance and repair of track and signal systems and maintenance of the commuter shop buildings. Currently, the MBTA and Amtrak have a contract under which Amtrak operates the commuter rail service. This contract expires on June 30, 2000. In 1998, the MBTA decided to separate the maintenance of equipment work on its commuter rail operations from the remainder of the commuter rail operations. Toward that end, the MBTA issued a Request for Letters of Interest seeking competitive bids for this work.
In January 1999, plaintiffs sent a letter to the MBTA’s general counsel regarding the MBTA’s request for proposals and asserted that any such action to change contractors would be subject to the Agreement. The MBTA did not respond to plaintiffs’ letter. On May 7, 1999, the MBTA accepted Bay State’s bid and announced that it would begin contract negotiations with Bay State. Within a few days, plaintiffs wrote to both the MBTA and the joint venturers of Bay State reiterating its position that the Agreement applied to the change of contractors and that any contract executed between Bay State and the MBTA must be in accordance with the Agreement. Bay State did not respond to plaintiffs’ letter.
On May 28, 1999, the MBTA wrote to plaintiffs and suggested that the parties begin negotiations on a “Transition Agreement” to address the issues that are presented by the transfer of services to Bay State. Although the MBTA noted it had a different view of the legal issues surrounding the Agreement, the MBTA advised plaintiffs that it intended the letter to satisfy the notice requirements set forth in paragraph 5 of the Agreement. The MBTA also suggested that a meeting be scheduled to address these issues with plaintiffs.
On July 22, 1999, a meeting was held between plaintiffs and the MBTA. The MBTA advised plaintiffs that it was its position that the transfer to Bay State was not as a result of a federal project and, therefore, the Agreement did not apply. The parties also discussed a Transition Agreement, although the MBTA could not answer all of plaintiffs’ questions regarding the details of the transition of services to Bay State. Although plaintiffs never requested that the parties submit their dispute to arbitration, they did request, on several occasions, that the MBTA provide them with information regarding the number, types and terms of jobs that would be available at Bay State, what right or ability current Amtrak employees would have to obtain employment with Bay State and under what conditions. The MBTA promised to provide as much information as it could and they did not respond to plaintiffs’ request until September 1999.
On September 15, 1999, the MBTA announced that it had executed a contract with Bay State to begin providing mechanical services on March 1, 2000. The next day, on September 16, 1999, the MBTA commenced an action in Superior Court against plaintiffs seeking an injunction, inter alia, to prohibit plaintiffs from striking. The MBTA later voluntarily dismissed this action. On the same day, the MBTA wrote to *639 plaintiffs following up on the July 22nd meeting and to inform plaintiffs of the new contract with Bay State. The MBTA repeated its suggestion that the parties negotiate a Transition Agreement and requested a meeting with plaintiffs to begin work on such an agreement.
On September 17, 1999, Bay State sent solicitation letters only to those current Amtrak employees who perform mechanical operations on the commuter rail lines, regarding prospective employment with Bay State in connection with its new contract to provide mechanical services on the commuter rail lines. On two separate occasions in September, the MBTA also sent letters to current Amtrak employees notifying them of the new contract with Bay State; advising them that Bay State intended to hire employees from the existing mechanical services workforce and at wages and benefits comparable to their current wages and benefits; and .urging them to consider Bay State’s solicitation.
Upon receiving Bay State’s solicitation and the MBTA’s first letter, plaintiffs scheduled a meeting with their members to discuss the ramifications of these letters. Plaintiffs then drafted a form letter which members could send to Bay State in response to its solicitation letter. The form letter informed Bay State that the employees believed that they had certain rights under the Agreement which needed to be resolved and directed Bay State to contact plaintiffs with respect to employment opportunities.
On September 29, 1999, the MBTA sent a letter giving plaintiffs notice, under paragraph 5 of the Agreement, of the approximate number of employees and job classifications which may be affected by the transition. Although the MBTA repeated that it was not altering its position that the Agreement did not apply, it requested that the parties commence negotiation of an implementation agreement. On the same date, Bay State sent a second solicitation letter to Amtrak employees asking them to reconsider its invitation to apply with Bay State.

DISCUSSION

A. G.L.c. 214, §6 — Anti-Injunction Act as to Bay State
The Anti-Injunction Act, G.L.c. 214, §6, provides for injunctive relief in very limited circumstances in cases involving labor disputes. Before injunctive relief will be granted, pursuant to §6(1), a three judge panel must find:
(a)that unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction . . . shall be issued on account of any threat or unlawful act excepting against the person or persons, association or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;
(b) that substantial and irreparable injury to the plaintiffs property will follow;
(c) that as to each item of relief granted greater injury will be inflicted upon the plaintiff by the denial of relief than will be inflicted upon the defendants by the granting of relief;
(d) that the plaintiff has no adequate remedy at law; and
(e) that the public officers charged with the duty to protect the plaintiffs property are unable or unwilling to furnish adequate protection.
Section 6(4) also requires that no restraining order shall issue to any plaintiff “who has failed to comply with any obligation imposed by law which is involved in the labor dispute or who has failed to make every reasonable effort to settle such dispute . . .” These requirements are “stated conjunctively," and “failure to find any one of them is fatal to injunctive relief.” (Emphasis added.) Seekonk Family Drive-in Theatre, Inc. v. Madino, 340 Mass. 425. 429 (1960).
The Massachusetts Anti-Injunction Act, G.L.c. 214, §6, is modeled after the Norris-LaGuardia Act, 29 U.S.C. §107. The purposes behind G.L.c. 214, §6 parallel those behind the federal statute. See Sanford v. Boston Edison Co., 316 Mass. 631 (1944). The underlying purpose of the Norris-LaGuardia Act was to leave the resolution of labor disputes to negotiation, and to prevent “courts from upsetting the natural interplay of the competing economic forces of labor and capital.” Brotherhood of R. Trainmen v. Chicago, R. & I.R. Co., 353 U.S. 30, 40 (1950). Based on this policy, the Norris-LaGuardia Act along with Massachusetts’ “little Norris-LaGuardia Act,” G.L.c. 214, §6, severely limit the jurisdiction of courts to issue injunctions in labor disputes.
The parties all agree that this action involves a labor dispute as defined under G.L.c. 149, §20(c).[4] The parties also agree that as between plaintiffs and Bay State, the Anti-Injunction Act applies and plaintiffs must comply with its requirements before an injunction will issue.

1. Unlawful Acts

To obtain injunctive relief, plaintiffs must demonstrate that Bay State has committed or threatened to commit unlawful acts. Plaintiffs concede that Bay State has not committed or threatened to commit any violent acts against plaintiffs. Plaintiffs, however, claim that Bay State’s failure to comply with the Agreement iii its negotiation and implementation of the contract with the MBTA is unlawful. Bay State is not a signatory to the Agreement and, as a matter of law, has no contractual obligations under it. Plaintiffs argue that Bay State is bound by the terms of the Agreement by virtue of Attachment A to the DOL certification letter which mandates that any contracts *640 into which MBTA enters the contractor be bound by the Agreement. There is, however, no provision in Bay State’s contract with the MBTA which incorporates Attachment A. Thus, Bay State is not bound by Attachment A or the obligations under the Agreement. Furthermore, assuming arguendo, that Bay State did have contractual obligations to plaintiffs, an alleged breach of contract does not constitute an unlawful act. Other than failure to comply with the Agreement, plaintiffs have not alleged any other purported unlawful acts by Bay State. Accordingly, plaintiffs have failed to prove that Bay State has committed or threatened to commit unlawful acts.
2. Substantial and Irreparable Injury; Inadequate Remedy at Law
Additionally, G.L.c. 214, §§6(l)(b), (c) and (d) require a view akin to general principles of equity: “substantial and irreparable to injury” to plaintiffs’ property, inadequacy of any remedy at law for plaintiffs, and greater injury to plaintiffs from denial of relief than from enjoining Bay State. Plaintiffs assert that their members will be irreparably harmed if Bay State is permitted to go forward implementing the new contract prior to the Agreement issues being resolved. If the contract should go forward, plaintiffs claim that their members will lose the benefit of having plaintiffs represent them in employment negotiations; that their members would be forced to make employment decisions on limited information; and that accepting employment with Bay State would force plaintiffs to lose seniority rights and suffer penalties with respect to their retirement pensions. Plaintiffs also claim that even if the Agreement issues are resolved after Bay State takes over, they will have lost the substantive and procedural protections under the Agreement which cannot be replaced.
While a potential loss of these benefits is a significant harm, the harm to Bay State and the public is greater should the injunction issue. See discussion, infra. Bay State’s contract is slated to begin March 1, 2000. It has been planned that there would be an overlap of operations between Bay State’s starting date and Amtrak’s ending date to ensure a smooth transition. Bay State needs adequate time to hire and train a sufficient workforce to begin operations in March 2000 and to take them over from Amtrak in June 2000. An injunction prohibiting Bay State from hiring a workforce until sifter an arbitration has concluded would delay the transition and could seriously disrupt the commuter rail service.
Additionally, plaintiffs have an adequate remedy at law. First, the MBTA has stipulated that no employee would lose any rights available under the Agreement and, secondly, if plaintiffs should prove that they have certain rights under the Agreement, a retroactive payment of protective benefits can remedy their injuries.

3. Police Protection

Lastly, plaintiffs concede that they have presented no evidence regarding the requirement under §6(1 )(e), that “public officers charged with the duty to protect plaintiffs’ property are unable or unwilling to furnish adequate protection.” Plaintiffs argue, however, that in light of the Supreme Court’s ruling in Boys Market, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235 (1970), they do not have to demonstrate that there was inadequate police protection. In Boys Market, Inc., supra at 249-53, the Supreme Court held that in peaceful labor disputes where a preliminary injunction compelling parties to arbitration is sought, the moving party need not comply with the literal terms of the anti-injunction provisions of the Norris-LaGuardia Act to obtain an injunction. That is, the terms of the Norris-LaGuardia Act should be accommodated in arbitration cases to permit injunctive relief. Id. at 253.
Under Massachusetts law it is clear that all of §6( 1) requirements must be met before injunctive relief will issue. Seekonk Family Drive-in Theatre, Inc. v. Madino, 340 Mass. at 429. No appellate court has addressed the issue of disregarding certain elements of the Massachusetts Anti-Injunction Act under certain circumstances. Even if this panel were to extend the holding in Boys Market, Inc., supra to the Massachusetts Anti-Injunction Act, plaintiffs’ reliance upon the case is misplaced. In Boys Market, Inc., the Court expressly noted that the holding was a narrow one and only applied in situations where a collective bargaining agreement contains mandatory arbitration provisions. Id. at 253. Here, there is no contract, collective bar-gaming agreement or otherwise, between plaintiffs and Bay State. There is no contractual authority to order Bay State to arbitrate any dispute with plaintiffs. Therefore, the principles outlined in Boys Market, Inc., supra, have no application under the circumstances of this case. Plaintiffs, under Seekonk Family Drive-in Theatre, Inc. v. Madino, supra, must prove each element of §6(1) to obtain injunctive relief.
Accordingly, the Panel find that plaintiffs have failed to satisfy the requirements set forth in G.L.c. 214, §6( 1) necessary to obtain injunctive relief against Bay State and, therefore, injunctive relief will be denied.

B. Preliminary Injunction Under Mass.R.Civ.P. 65(b) as to the MBTA

Plaintiffs and the MBTA also agree that this action involves a labor dispute. They dispute, however, whether the Anti-Injunction Act applies to the MBTA. The MBTA argues that under the Anti-Injunction Act, an injunction can only issue against a “person” and the MBTA is not a person under the law, it is a “body politic.” See Hansen v. Commonwealth, 344 Mass. 214, 219 (1962). Plaintiffs claim that when a public employer is acting as a private purchaser of services, as in this case, and the employees are employed by a private employer contracting with the public employer, *641 the Anti-Injunction Act does apply. As support, plaintiffs rely on Allen v. School Committee of Boston, 396 Mass. 582 (1986); Int’l Org. of Masters, etc. v. Woods Hole, Martha’s Vineyard & Nantucket Steamship Authority, 392 Mass. 811 (1984); School Committee of Boston v. Labor Relations Commission, 24 Mass.App.Ct. 721 (1987). The Panel, however, need .not reach the issue because even under, the less stringent requirements of a Rule 65(b) injunction, requirements which are incorporated in §6(b), (c) and (d) of the Anti Injunction Act, plaintiffs are not entitled to injunctive relief against the MBTA.
When asked to grant a preliminary injunction, the court considers the balancing test set forth in Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 617(1980). See Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 710 (1990). First, the court must evaluate in combination “the moving party’s claim of injury and chance of success on the merits.” Packaging Industries Group, Inc. v. Cheney, 380 Mass. at 617. “If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party . . . Only where the balance between the risks cuts in favor of the moving party may a preliminary injunction properly issue.” Id.; GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993). In appropriate cases, the court should also consider the risk of harm to the public interest. GTE Products Corp. v. Stewart, 414 Mass. at 723.

1. Likelihood of Success on the Merits.

To obtain injunctive relief, plaintiffs must demonstrate a likelihood of success on the merits. In this action, plaintiffs ask the Panel to declare that the Agreement applies to the change of contractors from Amtrak to Bay State and, therefore, the MBTA and plaintiffs must arbitrate all issues and disputes arising thereunder before the new contract can be implemented. At the hearing, plaintiffs admitted that under paragraph 13(a) of the Agreement, the issue of whether the Agreement applies to a particular dispute is an arbitrable issue. Subsequently, the MBTA and plaintiffs stipulated to submitting all the Agreement issues to arbitration. Plaintiffs argue that this arbitration must be completed before the MBTA and Bay State can implement their contract. The MBTA argues that there is nothing in the Agreement which requires that arbitration occur prior to a change in operations. Although these issues properly belong in arbitration, the Panel must examine this issue in determining plaintiffs’ likelihood of success on the merits. This evaluation will not invade the province of the arbitrator. See Hull Municipal Lighting Plant v. Massachusetts Municipal Wholesale Electric Co., 399 Mass. 640, 649 (1987).
A reading of the Agreement did not uncover a requirement that the parties must arbitrate all their disputed issues prior to a change of operations. Under paragraph 5(b) of the Agreement, the MBTA must give notice of any changes within 90 days of their implementation. In this case the MBTA gave notice to plaintiffs under paragraph 5(b) on May 28, 1999 and again on September 29, 1999. Once this notice was given, paragraph 5(b) requires that at request of either the MBTA or plaintiffs, the parties shall begin negotiations and, if negotiations fail, to submit the dispute to arbitration in accordance with paragraph 13 of the Agreement. Plaintiffs could have demanded that negotiations begin in May 1999 and could have submitted the dispute to arbitration long before now. Paragraph 13 sets forth the procedural requirements for proceeding to arbitration and there is no requirement that the change in operations cannot begin until after arbitration is completed. In fact, the Agreement provides procedural safeguards an employee affected by a change may invoke after a change has been made. Paragraph 16, for example, provides that an employee may file a claim with the MBTA within 60 days of the date he is terminated or laid off or within 18 months after the date his position with respect to his employment is otherwise worsened. Implicit in these procedural protections is the fact that a change in operations has already taken place.
Accordingly, with respect to plaintiffs’ claim of relief, it is unlikely that they will succeed on the merits on a claim that any arbitration must conclude before a change in operations may take place.

2. Irreparable Harm and No Adequate Remedy at Law.

Even if, arguendo, plaintiffs could succeed on the merits, plaintiffs must also demonstrate that they will suffer an irreparable harm if the injunction is not issued which will be greater than the harm the MBTA will suffer if the injunction is issued. As stated above in connection with the Anti-Injunction Act, plaintiffs’ irreparable harm is their members’ purported loss of certain procedural and substantive rights under the Agreement and the loss of seniority and certain benefits associated with their positions. The MBTA has stipulated that no employee who accepts employment with Bay State will lose any rights available under the Agreement. While the panel agrees that loss of seniority status and retirement benefits is a significant harm, also discussed supra at 11, the harm that the MBTA and the public will suffer is greater than that suffered by plaintiffs should the injunction issue.
The MBTA alleges that the transition from Amtrak to Bay State will take months and any delay in the implementation of the contract will seriously impact a safe and smooth continuation of the commuter rail service. Furthermore, the MBTA alleges that Amtrak’s contract expires on June 30, 2000 and if Bay State is not ready to begin its contract, the MBTA may be *642 forced to temporarily shut down the commuter rail service, impacting thousands of people each day. The impact on the public interest should an injunction issue is enormous. Thousands of people who use the commuter rails would be forced to use other methods of transportation, potentially clogging passage of highways and other streets to an extent that it could cause a public safety issue. See Massachusetts Bay Transportation Authority Advisory Board v. Massachusetts Bay Transportation Authority, 382 Mass. 569, 573 (1981). Accordingly, the MBTA and the public will suffer a greater harm if the injunction is issued than plaintiffs will suffer if the injunction is denied. Lastly, as stated more fully above, plaintiffs do have a sufficient adequate remedy at law. Accordingly, under the standards set forth in Packaging Industries Group Inc. v. Cheney, supra, or by extension G.L.c. 214, §6(b), (c) and (d), plaintiffs are also not entitled to injunctive relief against the MBTA.
C. Report to Supreme Judicial Court
At the conclusion of the hearing, plaintiffs requested that the Panel report the case to the Supreme Judicial Court under G.L.c. 214, §6(6). Section 6(6) provides that “(w)henever the court shall issue or deny a preliminary injunction . . . the court, upon the request of any party to the proceeding, shall forthwith report any questions of law involved in such issue or denial to the supreme judicial court...” “The making of such a report is not a matter of discretion but an imperative duty upon the judge . . . The statute . . . provides for a summary review of the questions of law arising out of the action of a judge who granted or denied the injunction and a prompt decision by the single justice.” Mengel v. Justices of the Superior Court, 313 Mass. 238, 244 (1943) (citations omitted). Therefore, the Panel shall today report the case to the Supreme Judicial Court in accordance with §6(6).

ORDER

Based upon the foregoing findings of fact and rulings of law and pursuant to G.L.c. 214, §6, the Court hereby ORDERS that plaintiffs’ motion for preliminary injunction is DENIED. Pursuant to G.L.c. 214, §(6)(6). the court shall report the denial of injunctive relief to the Supreme Judicial Court and stay further proceedings in this action.

 Plaintiffs also seek a declaration that the so-called “13(c) Agreement” is applicable to the maintenance operations that have been contracted to Bay State and that all issues arising under the Agreement must be resolved by arbitration (Count I). Plain tiffs also allege claims for intentional interference with contractual relations (Count III), breach of contract (Count IV) against Bay State, and civil conspiracy against both the MBTA and Bay State (Count V). These claims, however, are not pertinent to the court’s decision.

 General Laws, c. 149, §20(c) defines a “labor dispute” as “[A]ny controversy arising out of any demand of any character whatsoever concerning the terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in proximate relation of employer or employee.”